IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

ELMA MARTINEZ,

      **Plaintiff,**

vs.                                                      No. CIV 01-1147 WJ/LCS

JO ANNE B. BARNHART,
COMMISSIONER OF SOCIAL SECURITY,

      **Defendant.**

## MAGISTRATE JUDGE'S PROPOSED FINDINGS
## AND RECOMMENDED DISPOSITION

**THIS MATTER** came before the Court upon Plaintiff's Motion to Reverse and Remand (Doc. 9), filed May 3, 2002. The Commissioner of Social Security issued a final decision denying Plaintiff's application for supplemental security income. The United States Magistrate Judge, having considered the Motion, the memoranda submitted by the parties, the administrative record and the applicable law, finds that the motion is well-taken and recommends that it be **GRANTED IN PART**.

### PROPOSED FINDINGS

1.     Plaintiff, now forty-nine years old, filed her application for supplemental security income on January 8, 2000, alleging disability commencing in January 1989, due to lower back and tail bone pain. (R. at 13; 64; and 82.) The record indicates that Plaintiff also suffers from depression and an anxiety disorder. (R. at 165.) Plaintiff completed ten years of education and obtained her GED. (R. at 88.) Plaintiff's past relevant work was as a motel maid, housekeeper, bakery worker, restaurant worker, and flag person. (R. at 83; 103-107.)

2.     Plaintiff's application for supplemental security income was denied at the initial level on June 15, 2000, (R. at 45), and at the reconsideration level on September 11, 2000. (R. at 46.)

Plaintiff appealed the denial of her application by filing a Request for Hearing by Administrative Law Judge (ALJ) on October 4, 2000. (R. at 57-58.) The ALJ held a hearing on April 23, 2001, at which Plaintiff appeared and was represented by counsel. (R. at 24.)

3. The ALJ issued his decision on May 15, 2001, (R. at 10-18), analyzing Plaintiff's claim according to the sequential analysis set forth in 20 C.F.R. § 404.1520(a)-(f) and *Thompson v. Sullivan,* 987 F. 2d 1482, 1487 (10th Cir. 1993). At the first step of the sequential evaluation process, the ALJ found that Plaintiff had not engaged in substantial gainful activity since the filing of her application. (R. at 13.) At the second step, the ALJ determined that Plaintiff had severe impairments consisting of lumbar sprain and a major depressive disorder. (*Id*.) At the third step of the sequential analysis, the ALJ found that the severity of Plaintiff's impairments or combination of impairments had not met or equaled any of the impairments found in the Listing of Impairments, Appendix 1 to Subpart P, 20 C.F.R. §§ 404.1501-.1599. (R. at 14.) The ALJ then found that Plaintiff had the residual functional capacity for at least relatively simple, unskilled low stress light work, with certain relatively minimal postural limitations. (R. at 16.) In light of this RFC, the ALJ determined that Plaintiff was unable to perform her past relevant work. (R. at 17.) At step five, purportedly using the grids as a framework, the ALJ concluded that Plaintiff was not disabled within the meaning of the Social Security Act. (R. at 17-18.)

4. Plaintiff filed a request for review of the ALJ's decision, (R. at 8-9), and submitted a letter to the Appeals Council. (R. at 209-210.) On August 29, 2001, the Appeals Council, after considering the contentions raised in the letter, denied the request for review. (R. at 5-6.) Hence, the decision of the ALJ became the final decision of the Commissioner for judicial review purposes. On October 2, 2001, Plaintiff filed this action, seeking judicial review of the Commissioner's final

decision pursuant to 42 U.S.C. §405(g).

**Standard of Review**

5. The standard of review in this Social Security appeal is whether the Commissioner's final decision is supported by substantial evidence and whether he applied correct legal standards. *See Hamilton v. Sec'y of Health and Human Servs,* 961 F. 2d 1495, 1497-98 (10th Cir. 1992). Evidence is substantial if "a reasonable mind might accept [it] as adequate to support a conclusion." *Andrade v. Sec'y of Health and Human Svcs.*, 985 F. 2d 1045, 1047 (10th Cir. 1993) (*quoting Broadbent v. Harris*, 698 F. 2d 407, 414 (10th Cir. 1983) (*citation omitted*)). A decision of an ALJ is not supported by substantial evidence if the evidence supporting the decision is overwhelmed by other evidence on the record. *See Gossett v. Bowen*, 862 F. 2d 802, 805 (10th Cir. 1988).

6. In order to qualify for disability insurance benefits or supplemental security income, a claimant must establish a severe physical or mental impairment expected to result in death or last for a continuous period of twelve months which prevents the claimant from engaging in substantial gainful activity. *See Thompson v. Sullivan*, 987 F. 2d 1482, 1486 (10th Cir. 1993)(citing 42 U.S.C. § 423(d)(1)(A)). At the first four levels of the sequential evaluation process, the claimant must show she is not engaged in substantial gainful employment, she has an impairment or combination of impairments severe enough to limit her ability to do basic work activities, and her impairment meets or equals one of the presumptively disabling impairments listed in the regulations under 20 C.F.R. Part 404, Subpt. P, App. 1, or she is unable to perform work she had done in the past. 20 C.F.R. §§ 404.1520 and 416.920. At the fifth step of the evaluation, the burden of proof shifts to the Commissioner to show the claimant is able to perform other substantial gainful activity considering her residual functional capacity, age, education, and prior work experience. *See id.*

**Administrative Record**

  7. On April 28, 2000, Dr. John C. Lund, M.D. examined Plaintiff. (R. at 134.) Dr. Lund recounted that Plaintiff injured her back in an automobile accident in 1989. (*Id*.) At that time, her back was x-rayed, but she did not have an MRI or a CAT scan. (*Id.*) Until 1991, Plaintiff received intermittent physical therapy, chiropractic treatments, and pain medication. (*Id.*) Plaintiff stopped receiving medical treatment because she could not afford it. (*Id.*) Plaintiff complained of non-radiating lumbo-sacral back pain on a daily basis and reported that she could only sit or stand for forty-five to sixty minutes without discomfort. (*Id.*)

  8. Physical examination was unremarkable. (R. at 136.) Dr. Lund found a full range of motion of all extremities and no muscular atrophy or spasms and states that there was "[n]o vertebral tenderness to palpation, only when asked; lateral flexion 5-10 degrees; forward flexion 5-10 degrees; extension 5 degrees." (*Id*.) Dr. Lund concluded that Plaintiff was probably suffering from chronic lumbar-sacral muscle spasms and para-vertebral ligament strain. (*Id*.) Dr. Lund surmised that Plaintiff may have chronic osteo-arthritis of the lumbar spine if confirmed by x-rays, but did not think that there was any nerve root involvement. (*Id*.) Dr. Lund opined that Plaintiff would be able to work if she had an intense course of physical therapy. (*Id*.) X-rays taken on June 1, 2000 revealed no abnormalities. (R. at 137.)

  9. On June 14, 2000, Dr. Donald B. Stewart, M.D., an agency medical consultant, completed a Physical Residual Functional Capacity Assessment Form. (R. at 146-153.) Dr. Stewart found that Plaintiff could lift up to twenty pounds occasionally, and ten pounds frequently, could stand or walk for about six hours in an eight hour workday, could sit about six hours of an eight hour work day, and had an unlimited ability to push and pull. (R. at 147.) Dr. Stewart further found that

Plaintiff was limited to occasionally climbing, stooping and crawling with help. (R. at 148.)

10. On September 26, 2000, Donald F. Chakra, L.M.T. wrote that Plaintiff was unable to work due to her back pain. (R. at 154.) On October 10, 2000, Mr. Chakra performed a "body analysis" and concluded that Plaintiff's spine, shoulders, neck and knees all deviated from proper alignment. (R. at 158.) Mr. Chakra believed that Plaintiff's pain could be eased with specific massage work and exercise. (*Id.*)

11. Plaintiff presented to the Border Area Mental Health Services Clinic on January 23, 2001, stating that she needed to talk to someone because she was under a lot of pressure, she was worried, her mind was racing, she found it hard to relax, and she felt like she was "no good because she did not have any skills." (R. at 161.) Plaintiff had serious thoughts of suicide, serious depression, anxiety, hallucinations and trouble understanding, concentrating and remembering. (R. at 164.) Plaintiff described hallucinations and reported feeling as if someone was in her house when no one was there. (*Id.*)

12. On February 27, 2001, LuAnn Wilmeth, M.A. diagnosed major depressive disorder, recurrent severe with psychotic features and general anxiety disorder, and assigned Plaintiff a Global Functioning Assessment Scale (GAF) of 45.[1] (R. at 165-166.) Ms. Wilmeth and K.A. Hutchinson, Ph.D. recommended outpatient weekly therapy and monthly pharmacotherapy. (R. at 166.) Ms. Wilmeth developed a detailed treatment plan for Plaintiff, which was approved on March 19, 2001.

---

[1] A GAF score is a subjective determination which represents "the clinician's judgment of the individual's overall level of functioning." *See* American Psychiatric Assoc., Diagnostic and Statistical Manual of Mental Disorders (DSM-IV), (4th ed. 1994) at 30. The GAF Scale ranges from 100 (superior functioning) to 1 (persistent danger of severely hurting self or others, persistent inability to maintain minimal personal hygiene, or serious suicidal act with clear expectation of death). *See id.* at 32.

(R. at 167-170.) Thereafter, Plaintiff underwent regular therapy with Ms. Wilmeth. (R. at 171-183.)

13. Plaintiff wrote on January 8, 2000 that she might have to stop babysitting for a two-year-old child because she could not stoop, bend down or lift the child. (R. at 93.) Plaintiff wrote that she wanted to see a medical doctor to get pain pills because her extra strength Tylenol did not work, but that she could not afford to see a medical doctor. (R. at 90; 93.) Plaintiff was unable to drive standard cars due to the back pain. (R. at 93.) Plaintiff was going to a chiropractor and the adjustments helped, but only for a little while. (R. at 95.) In an undated letter, Plaintiff wrote that she was unable to find any jobs that did not require lifting more than ten pounds or walking/standing for more than six hours of an eight hour workday. (R. at 117.)

14. On June 26, 2000, Plaintiff wrote that she only took Flexaril[2] only once or twice a day because it was too expensive. (R. at 124.) On several occasions, Plaintiff wrote that the pain interfered with her sex life. (R. at 96; 121; 123.) On September 23, 2000, Plaintiff wrote that she hardly did any housework and the pain was getting worse. (R. at 125-26.) Plaintiff was taking Paxil,[3] Skelaxin,[4] and Flexaril. (R. at 130.) She had also been prescribed Percoset,[5] but she could not afford it. (*Id.*)

---

[2] Flexaril is indicated as an adjunct to rest and physical therapy for the relief of muscle spasm associated with acute, painful musculoskeletal conditions. PHYSICIAN'S DESK REFERENCE 1797 (54th ed. 2000).

[3] Paxil is an antidepressant. PHYSICIAN'S DESK REFERENCE 3027 (54th ed. 2000).

[4] Skelaxin is indicated as an adjunct to rest and physical therapy for the relief of muscle spasm associated with acute, painful musculoskeletal conditions. PHYSICIAN'S DESK REFERENCE 909 (54th ed. 2000).

[5] Percoset is indicated for the relief of moderate to moderately severe pain. PHYSICIAN'S DESK REFERENCE 1037 (54th ed. 2000).

15. At the April 23, 2001 evidentiary hearing, Plaintiff testified that her back problems started with a car accident in 1989. (R. at 31.) Plaintiff described constant lower back pain radiating down her right leg to the calf. (*Id.*) Plaintiff had to quit her job about two weeks after the accident due to the pain. (R. at 32.) Her medications temporarily relieved the pain but they made her dizzy and drowsy. (*Id.*)

16. Plaintiff had been unable to do any cleaning or cooking for the two years prior to the hearing. (R. at 32-33.) She did not like to drive and had difficulty sleeping due to the pain. (R. at 33.) Plaintiff's parents had to drive her to the hearing. (*Id.*) Plaintiff had been receiving therapy from the Border Area Mental Health Center for about three or four months because she could not "do too many things" and she was not "feeling too good." (R. at 33-34.)

17. Plaintiff had failed the tenth grade, received a GED, and did not have any vocational training. (R. at 35.) Plaintiff had to quit her flagger job after the accident. (*Id.*) Plaintiff tried to work as a cookie bagger, a motel maid, a fast food worker and a babysitter, but had to quit each job after a short time due to her back pain. (R. at 36-37.) Plaintiff had to use a pillow and sit a certain way in a car for a one hour drive. (R. at 38.) Plaintiff was unable to bend down to tie her shoes and had pain getting into the bathtub. (*Id.*)

18. Plaintiff did not feel like going out anywhere and stayed home. (R. at 39-40.) Plaintiff would cry a lot and sometimes had hallucinations. (R. at 40.) When she thought she saw something out of the corner of her eye, Plaintiff would go around the house checking everything to make sure no one was there. (*Id.*) Plaintiff also had a poor memory. (*Id.*) Plaintiff's husband would get mad at her because she could not do the housework and he had to do his own laundry. (R. at 41.)

**Discussion**

19. Plaintiff contends that the ALJ's finding that Plaintiff can work in spite of her mental impairment, the ALJ's reliance on the Grids and the ALJ's credibility finding are not supported by substantial evidence and are contrary to law.

20. The ALJ found that Plaintiff had the severe impairment of major depressive disorder at step two that did not meet the listings at step three. When a severe mental impairment which does not meet the listings is present, the determination of mental residual functional capacity is crucial to evaluation of an individual's capacity to engage in substantial gainful employment. *Cruse v. Dept. of Health & Human Servs.,* 49 F. 3d 614, 619 (10th Cir. 1995); *Washington v. Shalala*, 37 F. 3d 1437, 1440 (10th Cir. 1994); 20 C.F.R. Pt. 404, Subpt. P. App. 1, § 12.00(A). In assessing a claimant's mental residual functional capacity, the ALJ should consider, among other things, the claimant's ability to engage in the activities of daily living, to interact appropriately with the public, supervisors and co-workers, to focus long enough to compete tasks in a timely manner, and to adapt to stressful circumstances without either withdrawing from the situation or experiencing increased signs and symptoms of the claimant's mental disorder. *Washington*, 37 F. 3d at 1440. The ALJ failed to consider the *Washington* factors in his opinion. On remand, the ALJ should fully discuss these factors in light of the results of a full consultative psychological evaluation

21. The record establishes that Plaintiff has a severe mental disorder, but it is insufficient to ascertain the full extent of this condition and the impact on Plaintiffs ability to work. The ALJ has a basic duty of inquiry in every case. *Dixon v. Heckler*, 811 F. 2d 506, 510 (10th Cir. 1987). If medical sources cannot provide sufficient medical evidence, then the ALJ may order a consultative examination. *See* 20 C. F. R. § 416.917. The ALJ has broad latitude in ordering such examinations.

*Diaz v. Secy of Health and Human Servs.*, 898 F. 2d 774, 778 (10th Cir.1990).

22. In deciding whether the ALJ erred in not ordering a consultation, the Court must consider whether there is sufficient medical evidence in the record so that the ALJ can make an informed decision without a consultative examination. *Matthews v. Bowen*, 879 F. 2d 422, 424 (8th Cir. 1989). In this situation there is scant evidence concerning the effect of the Plaintiff's mental condition on her ability to work. The ALJ could not have made an informed decision without a psychological consultation. A remand is thus required for the ALJ to obtain a psychological consultative examination.

23. After determining that Plaintiff was unable to perform her past relevant work, the ALJ proceeded to step five and, purportedly using the Grids only as a framework, found that Plaintiff was not disabled. (R. at 17-18.) At step five, the burden of proof shifts to the Commissioner to show that the claimant retains the residual functional capacity to do work which exists in the national economy. *Thompson v. Sullivan*, 987 F. 2d 1482, 1487 (10th Cir. 1993). In certain cases, at the fifth step, the ALJ may rely solely on the Grids.

24. The Grids assume that a claimant's sole limitation is lack of strength, also known as an exertional impairment. *See* 20 C.F.R. Part 404, Subpt. P, App. 2, §200.00 (e)(2). In a case such as this, where a claimant presents evidence of both exertional and non-exertional impairments, the ALJ must make findings on how much a claimant's work ability is further diminished by the non-exertional limitations. *Id.* If the non-exertional limitations are significant enough to further reduce work capacity, the ALJ may not rely solely on the Grids but must instead give full consideration to all relevant facts, including expert vocational testimony if necessary, in order to determine whether a claimant is disabled. *See Channel v. Heckler*, 747 F. 2d 577, 583 (10th Cir. 1984).

25. The Grids cannot be used conclusively when a non-exertional impairment limits a claimant's ability to perform the full range of work in a particular residual functional capacity category. *See Talbot v. Heckler*, 814 F. 2d 1456, 1460 (10th Cir. 1987). When non-exertional limitations are present, the Grids can only be used as a framework for considering the extent to which such limitations further diminish the claimant's ability to work by reducing the types of jobs that the claimant would otherwise be able to perform. *Talbot*, 814 F.2d at 1460; 20 C.F.R. Pt. 404, Subpt. P., App. 2, § 200.00 (e)(2). In assessing the extent to which a claimant's ability to work is eroded by her non-exertional impairments, the ALJ will normally need to obtain the testimony of a vocational expert. *See Cruse,* 49 F. 3d at 619 (*citing Hargis v. Sullivan*, 945 F.2d 1482, 1491 (10th Cir.1991)).

26. The ALJ found that Plaintiff had the residual functional capacity for light work, limited to unskilled labor. This determination is not supported by substantial evidence and the ALJ did not apply correct legal standards. The record establishes that Plaintiff suffered from a severe mental impairment that affected her ability to work. When both exertional and non- exertional impairments diminish a claimant's residual functional capacity, the Commissioner must produce expert vocational testimony to establish the existence of jobs in the national economy. The ALJ should not guess at the degree to which Plaintiff vocational ability is limited by her impairments. *See Miller v. Chater*, 99 F. 3d 972, 977 (10th Cir. 1996). The ALJ did not obtain testimony from a vocational expert and relied conclusively on the Grids. The ALJ's determination at step five is not supported by substantial evidence. On remand, the ALJ should produce vocational expert testimony at step five to determine whether Plaintiff is disabled.

27. Plaintiff asserts that the ALJ erred in assessing her credibility. "Credibility determinations are peculiarly the province of the finder of fact," and will not be overturned if

10

supported by substantial evidence. *Diaz*, 898 F. 2d at 777. Plaintiff established that she suffers from a pain-producing impairment. Therefore, the ALJ was required to consider her complaints of pain by evaluating her use of pain medication, her attempts to obtain relief, the frequency of her medical contacts, and the nature of her daily activities, as well as subjective measures of credibility including the consistency or compatibility of non-medical testimony with the objective medical evidence. *See Kepler v. Chater*, 68 F.3d 387, 391 (10th Cir. 1995). The ALJ did not analyze all of these factors in his decision. On remand, the ALJ should carefully consider all of the *Kepler* factors in assessing Plaintiff's credibility.

## RECOMMENDED DISPOSITION

I recommend that Plaintiff's Motion to Reverse or Remand (Doc. 9), filed May 3, 2002, be **GRANTED IN PART** and that this matter be **REMANDED** to the Commissioner for the ALJ to evaluate Plaintiff's metal impairment in accordance with *Washington v. Shalala*, 37 F. 3d 1437, 1440 (10th Cir. 1994), to obtain psychological consultative evaluation, to obtain vocational expert testimony, and to re-evaluate Plaintiff's credibility.

Timely objections to the foregoing may be made pursuant to 28 U.S.C. §636(b)(1)(C). Within ten days after a party is served with a copy of these proposed findings and recommendations that party may file with the Clerk of the District Court written objections to such proposed findings and recommendations. A party must file any objections within the ten day period allowed if that party wants to have appellate review of the proposed findings and recommendations. If no objections are filed, no appellate review will be allowed.

_____
**LESLIE C. SMITH**
**UNITED STATES MAGISTRATE JUDGE**